IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PEDRO GONZALEZ JR., as | ) | |
| **Administrator for the Estate of** | ) | |
| **Pedro Gonzalez III,** | ) | |
| | ) | **No. 11 C 8356** |
| **Plaintiff,** | ) | |
| | ) | **Jeffrey T. Gilbert** |
| **v.** | ) | **Magistrate Judge** |
| | ) | |
| **SGT. OLSON, P.O. MOTYKA,** | ) | |
| **and P.O. TUNZI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Pedro Gonzalez Jr. ("Plaintiff"), as Administrator for the Estate of Pedro

Gonzalez III ("Gonzalez"), brings this action against Defendants Sergeant Eric Olson, Officer

Jason Motyka, and Officer Richard Tunzi (collectively, "Defendants") under 42 U.S.C. § 1983

and also alleges various state law claims. According to Plaintiff, on June 15, 2011, Gonzalez

was standing outside his home, speaking to his father on his cell phone. One or more Defendants

exited an unmarked police squad car and approached Gonzalez. Gonzalez ran away. Defendants

Olson and Motyka shot Gonzalez in the back as he fled, killing him. Plaintiff alleges that

Gonzalez was unarmed and that Defendants used excessive force when Olson and Motyka fatally

shot him, thereby violating his constitutional rights. Defendants admit that Olson and Motyka

fired shots at Gonzalez, but assert that the use of deadly force was justified because Gonzalez

was armed and pointed a gun at Defendants as he fled.

The parties have consented to the jurisdiction of a United States Magistrate Judge

pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1 for all proceedings, including trial and entry

of final judgment. ECF No. 271. Currently before the Court are Plaintiff's Motions *in Limine*

No. 1-14 and Defendants' Motions *in Limine* No. 1-35. For the following reasons, the motions are granted in part, denied in part taken under advisement in part, and reserved in part.

## LEGAL STANDARD

Trial courts have broad discretion in ruling on evidentiary issues before and during trial. *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). Accordingly, "[a]lthough the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Motions *in limine* are intended "to avoid the delay and occasional prejudice caused by objections and offers of proof at trial." *Wilson v. Williams,* 182 F.3d 562, 566 (7th Cir. 1999). "The prudent use of the *in limine* motion sharpens the focus of later trial proceedings and permits the parties to focus their preparation on those matters that will be considered by the jury." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997).

The Court will grant a motion *in limine* only where the evidence is clearly inadmissible for any purpose. *See id.* (a motion *in limine* "performs a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissable [sic] for any purpose"). Some evidentiary submissions, however, cannot be evaluated accurately or sufficiently prior to trial. *Id.* "In these instances, it is necessary to defer ruling until during trial, when the trial judge can better estimate its impact on the jury." *Id.*

Rulings on motions *in limine* are "subject to change when the case unfolds[.]" *Luce*, 469 U.S. at 41; *see also Farfaras v. Citizens Bank & Trust of Chi.,* 433 F.3d 558, 565 (7th Cir. 2006). Indeed, "even if nothing unexpected happens at trial, the district judge is free, in the exercise of

sound judicial discretion, to alter a previous *in limine* ruling." *Luce,* 469 U.S. at 41-42. As such, the Court is free to revisit the following rulings as appropriate during trial.

## ANALYSIS

### I. Plaintiff's Motions *in Limine*

Plaintiff's Motions No. 3, 4, 6, 7, and 8 are granted without objection. Plaintiff's Motions No. 1, 2, 5, 10, and 12 are granted over Defendants' objection. Plaintiff's Motions No. 9, 11, and 14 are denied. Plaintiff's Motion No. 13 is reserved for trial.

Defendants' Motion No. 5 is similar to Plaintiff's Motion No. 6 and is addressed below. It is granted. Defendants' Motion No. 8 is corollary to Plaintiff's Motion No. 11 and it, too, is addressed below. It is granted in part and denied in part.

The Court's rulings on these motions are set forth in more detail below.

**1.      Motion No. 1 to bar all "gang evidence" from trial.**

Plaintiff seeks to bar Defendants from introducing "gang evidence" at trial, including evidence that Gonzalez lived in a "gang neighborhood," that there was a "gang war" in the neighborhood, and that Gonzalez's neighbor recently had been killed in a gang-related shooting. Plaintiff's motion is granted. Neither party has proffered evidence that Gonzalez was a gang member. Nor is gang evidence probative of any fact the jury has to decide. Whether Defendants' use of deadly force was constitutionally reasonable in this case depends on their interactions with Gonzalez, not on any gang affiliation Gonzalez may have had (and, again, neither side has proffered evidence that he was so affiliated) or the reputation of the neighborhood in which he lived. Simply put, this is not a gang case; it is a shooting case. Any mention of gangs by Defendants is barred under Federal Rule of Evidence ("FRE") 401 and FRE 402 unless Plaintiff opens the door to the admission of such evidence.

Moreover, any mention of gangs or gang activity in this case, or characterization of the neighborhood in which Gonzalez lived and the shooting occurred as being a "bad neighborhood" or "high crime area," is unduly prejudicial within the meaning of FRE 403. *See, e.g., United States v. Irwin*, 87 F.3d 860, 865 (7th Cir. 1996) (noting "the possibility that a jury will attach a propensity for committing crimes to [individuals] who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict"). Defendants contend Gonzalez pointed a gun at them; Plaintiff contends Gonzalez did not have a gun. Evidence that Gonzalez's neighborhood was a high crime area or an area of gang or criminal activity could lead the jury to have negative feelings toward Gonzalez or lead them to believe he was involved in gang activity, neither of which make more or less true whether he pointed a gun at Defendants before he was shot. *See id.* ("Guilt by association is a genuine concern whenever gang evidence is admitted."). Such propensity evidence is irrelevant and prejudicial. *Taylor v. City of Chicago*, 2012 WL 3686642, at *2 (N.D. Ill. Aug. 24, 2012).

As Judge Shadur explained in *Taylor*, testimony that the plaintiff was arrested in a "high crime area" as a basis for police action "is a sort of 'guilt by geography' – instead the charged officers' conduct vis-à-vis [the plaintiff] ought to be judged by their own contacts with *him* (or perhaps their own knowledge of *him*)." *Id.* at *1 (emphasis in original). Similarly, Seventh Circuit Pattern Jury Instructions 7.08 and 7.09, which the parties propose to use in this case, focus the jury on the particular facts and circumstances of a defendant's encounter with a plaintiff in making its determination whether a defendant's use of force was reasonable – not on some sort of "danger in the air" because of where the encounter took place.

Defendants argue that evidence of other shootings in the area in the days prior to the Gonzalez shooting, as well as their knowledge of gang and narcotics activity in the area, are

relevant to their "state of mind and course of conduct" in their encounter with Gonzalez. ECF No. 258 at 1-2. Plaintiff has not moved to exclude evidence of the prior shootings; Plaintiff's motion seeks only to exclude reference to gangs and gang activity and similar generalizations or characterizations. To the extent Defendants wish to elicit testimony regarding these other shootings, they can do so without referencing gangs or characterizing the neighborhood in which the events occurred in the days preceding Gonzalez's death as a gang neighborhood or high crime area.

2. **Motion No. 2 to bar evidence that Defendants were in a "gang tactical unit" or that their assignment was "gang violence suppression."**

Plaintiff also seeks to bar evidence that Defendants were in a "gang tactical unit" and that their assignment on the day of the Gonzalez shooting was one of "gang violence suppression." As discussed above, this is not a gang case, and any mention of gangs is both irrelevant and unduly prejudicial. Plaintiff's motion is granted.

Defendants argue that this information is "unavoidable" if Defendants are to testify about their specific assignment that day, which, according to Defendants, was to "prevent further violence [following the prior shootings] and try to gather any information about the shootings or homicides, more specifically about what gang conflict or conflicts might be going on that were leading to the violence." ECF No. 258 at 3. The Court disagrees. Just as Defendants can testify about the prior shootings without discussing gang activity, they also sufficiently can explain why they supposedly were saturating the area the day of the Gonzalez shooting and what they were investigating without going into detail about gangs or gang conflicts. For the reasons discussed above, such details are irrelevant to whether or not Gonzalez pointed a gun at the police officers before he was shot and are unduly prejudicial here.

**3.    Motion No. 5 to bar hearsay statements attributed to Ashley Bruno and Cherlyn Benavidez.**

Plaintiff seeks to bar certain statements attributed to third-party witnesses Ashley Bruno and Cherlyn Benavidez. Plaintiff's motion is granted.

### A. Ashley Bruno

Gonzalez was taken to Mt. Sinai Hospital after the June 15, 2011 shooting and a crowd formed outside the hospital. Defendants allege that third-party witness Ashley Bruno was in that crowd and, while there, shouted, "Dro had that gun for protection!" Plaintiff moves to exclude this statement as inadmissible hearsay. Defendants argue that the statement is admissible under the excited utterance exception to the rule against hearsay. The Court agrees with Plaintiff and finds the statement to be inadmissible.

#### i. Factual Background

The parties disagree on the facts relating to Bruno's alleged statement. Defendants contend that Bruno watched as Gonzalez was shot by police. ECF No. 258 at 7. She then traveled to Mt. Sinai Hospital, where, upon learning of Gonzalez's death, she blurted out, "Fuck the police!," "Dro had that gun for protection!," and "Police didn't have to shoot him!" *Id.* According to Defendants, Bruno "was still under the excitement of the shooting itself when she made [the statement at issue], which is sufficient for admissibility," and "the news that Pedro was dead, another shocking event, compounded Ms. Bruno's stress, leading to her outburst." *Id.* at 7-8.

Plaintiff contends that Defendants have not shown Bruno to be the red-haired girl or woman identified in police reports as the declarant. ECF No. 281-1 at 2. Plaintiff also points out that Bruno denies going to the hospital the night of the Gonzalez shooting, that the time the proffered statements were made is unclear, and that there are inconsistencies in the reports of the

police officers who say they witnessed the red-haired girl's statements. *Id.* at 2-3. Plaintiff further contends that Defendants have no reliable basis to determine the red-haired girl was informed of Gonzalez's death prior to making the statement. *Id.* at 4.

### ii. Analysis

FRE 803(2) carves out an excited utterance exception to the rule against hearsay based on the theory that a person is unlikely to fabricate lies while his mind is preoccupied with the stress of an exciting event. *United States v. Joy*, 192 F.3d 761, 766 (7th Cir. 1999). For a hearsay statement to be admissible under the excited utterance exception, the proponent of the statement must demonstrate that "(1) a startling event occurred; (2) the declarant makes the statement while under the stress of excitement caused by the startling event; and (3) the declarant's statement relates to the startling event." *Id.* The party seeking to admit the statement has the burden of establishing each element of the excited utterance exception. *United States v. Vargas*, 689 F.3d 867, 877 (7th Cir. 2012).

At the outset, Defendants have not specified what startling event prompted the statement they attribute to Bruno, suggesting it was either the Gonzalez shooting ("Ms. Bruno was still under the excitement of the shooting itself when she made these statements, which is sufficient for admissibility"), the announcement of his death outside the hospital ("[t]he news that Pedro was dead, another shocking event, compounded Ms. Bruno's stress, leading to her outburst"), or perhaps both ("[t]here can be no doubt that both the shooting and the news of Mr. Gonzalez's death were sufficiently startling to meet the first requirement of the excited utterance exception"). *See* ECF No. 258 at 7-8.

Whatever the startling event was, the statement it supposedly provoked is too remote in time to qualify as an excited utterance. Defendants point out that "[a]n excited utterance need

not be contemporaneous with the startling event to be admissible under Rule 803(2)." ECF No. 258 at 7 (quoting *Joy*, 192 F.3d at 766). That is true, but Defendants have not specified when the purported statement occurred with any detail besides stating it was sometime after an announcement that Gonzalez was dead (and even this is uncertain, as Officer Malenock's report suggests the unidentified red-haired woman made the statement after being told she could not enter the emergency room (*see* ECF No. 247-1 at 10)). It is not clear how close in time the proffered statement was to the shooting and/or the announcement of Gonzalez's death. It is Defendants' burden to prove the excited utterance exception applies, and they have not met their burden with such a vague foundational showing.

In addition, the circumstantial guarantees of trustworthiness that underlie the excited utterance exception to the hearsay rule are weak here. The premise of the exception is that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." *United States v. Boyce*, 742 F.3d 792, 796 (7th 2014) (internal quotations and citations omitted). In other words, to qualify as an excited utterance, "the statement must have been a spontaneous reaction to the startling event and not the result of reflective thought." *Id.* The statement at issue here – "Dro had that gun for protection" – does not fall within these parameters. The statement purports to explain why Gonzalez supposedly had a gun. It is not a "spontaneous reaction" to either the shooting itself or an announcement that Gonzalez died. It is, instead, a product of conscious thought as to why Gonzalez supposedly had a gun. Because the statement is much more a product of reflection and explanation than a spontaneous reaction to a startling event, it does not fall within the excited utterance exception.

Additionally, even if Defendants could meet their burden in establishing that the excited utterance exception applies here, there is still another foundational issue. The proponent of any hearsay statement must establish not only that an exception to the hearsay rule applies, but also that the declarant had personal knowledge of the facts in the statement. *See* FED. R. EVID. 803 advisory committee's note ("In a hearsay situation, the declarant is, of course, a witness, and neither this rule nor Rule 804 dispenses with the requirement of firsthand knowledge."). Defendants have not pointed to any evidence showing the source of Bruno's knowledge that Gonzalez supposedly had a gun. Indeed, Bruno testified at her deposition that she had never seen Gonzalez with a gun. ECF No. 259-1 at 32.

Finally, though Defendants chiefly rely on the excited utterance exception in their attempt to admit Bruno's purported statements, there is at least a suggestion in their brief that Bruno's statements also may be admissible pursuant to the FRE 803(8) public records exception because the purported statements appear in police reports. This argument also fails. Police reports generally do not pass FRE 803(8) muster except to the extent they incorporate an officer's firsthand observations, because "the presumption of reliability that serves as the premise for the public-records exception does not attach to third parties who themselves have no public duty to report." *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). And Bruno's purported statements within the police report are prohibited by FRE 805 as hearsay within hearsay. As set forth above, Defendants have not asserted an independent basis for admission.

In sum, the bases Defendants assert for the admissibility of Bruno's purported statement are too tenuous to permit such evidence at trial for the reasons discussed and in the face of FRE 403. Defendants are barred from introducing Bruno's purported statement that "Dro had a gun for protection" through police reports, testimony, or some other avenue. The Court reserves

ruling on whether Defendants may attempt to impeach Bruno using her purported statement if Plaintiff opens the door.

## B. Cherlyn Benavidez

Plaintiff's Motion No. 5 also seeks to bar the out of court statements of third-party witness Cherlyn Benavidez and statements Benavidez attributes to Gonzalez. The motion is granted.

### i. Factual Background

Third-party witness Cherlyn Benavidez was a Unit Secretary at Mt. Sinai Hospital at the time of the Gonzalez shooting. Benavidez was on duty when Jovany Diaz, Gonzalez's 15-year-old neighbor, arrived at the hospital after being fatally shot two days prior to the Gonzalez shooting. Benavidez testified at her deposition that on the night Diaz was brought to the hospital, she saw a "very agitated" young man "going back and forth in front [of the hospital]," speaking on his phone and making statements along the lines of, "We're going to handle this. We'll do this. We'll take care of this." ECF No. 258-2 at 12. She testified that when the man was on the phone, "his shirt kind of lifted, and I saw something. . . . [I]t was black – it didn't look like a phone carrier. But it was just a glance. I mean, I'm not going to say that it was definitely a gun, but his posture and the way he was leaning." *Id.* at 13, 15. She later described the black item as "the – what I thought could have been – was a bulk." *Id.* at 21. She admitted she never heard the man mention a gun or any sort of drugs, mention any date or time, or use any names while on the phone. *Id.* at 19-20. Nothing was in the man's hands except for a phone. *Id.* The man gave her a "bad feeling." *Id.* at 13. She alerted some police officers at the hospital of her discomfort. *Id.* at 12.

Benavidez was working at the hospital two days later when Gonzalez arrived after he was shot by Defendants. She was approached by a detective, who took her to the body bag where Gonzalez was lying. *Id.* at 26. The detective unzipped the body bag and Benavidez identified Gonzalez as the man she saw speaking on a cell phone outside the hospital the night of the Diaz shooting. *Id.* at 26-27. According to the parties' briefs, police reports documenting Benavidez's identification of Gonzalez's body and her statements from the night of the Diaz shooting exist, though none were attached as exhibits.

### ii. Analysis

Plaintiff argues that Benavidez's reported observations of Gonzalez's alleged statements are inadmissible hearsay and unduly prejudicial. Defendants first make the conclusory argument that any police reports documenting Benavidez's reported observations are admissible under the public or business records exceptions to the rule against hearsay. Defendants say nothing further in advance of their argument beyond citing FRE 803(6) and (8) and one unpublished case. This argument is deemed waived. *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) ("[U]nsupported and underdeveloped arguments are waived."). In any event, Benavidez's statements to the officer are impermissible hearsay within hearsay. FED. R. EVID. 805. And, consistent with that logic, police reports are generally not admissible under FRE 803(8) except to the extent they incorporate the officer's firsthand observations. *Jordan*, 712 F.3d at 1133.

Even if the reports themselves were admissible, the hearsay statements contained therein are not. Defendants assert that Gonzalez's purported statement is an excited utterance and shows his then-existing mental or emotional condition. The Court disagrees. Gonzalez's purported statement – "We're going to handle this" – is much too vague to be tied to a startling event or

some sort of "plan" Gonzalez may have had. There is simply no foundation for Defendants' inference that Gonzalez was "promising retaliation" for Diaz's death.

Nor is the purported statement relevant to any issue the jury needs to decide here. Defendants argue the statement, and the equally vague evidence of a black bulge at Gonzalez's waist, rebuts Plaintiff's claim that Gonzalez did not have a gun when he was shot two days later. Benavidez's statement about the bulge is very weak and more prejudicial than probative of anything. The Court will not permit the jury to speculate whether Gonzalez had a gun based on a "glance" Benavidez got of Gonzalez's waist and her ensuing "bad feeling" about him.

Defendants' last argument, that Benavidez's comments to the detective are admissible to show the effect on the listener, is completely without merit. There is no indication that the detective is in any way involved in this case, so any "subsequent actions he took based on that information" (ECF No. 257 at 14) are irrelevant.

Plaintiff's motion is granted.

4. **Motion No. 6 to exclude non-party witnesses from the courtroom during trial.**

Defendants do not object to Plaintiff's Motion No. 6 to exclude non-party witnesses from the courtroom during trial, and have included their own similar motion (Defendants' Motion No. 5), which also seeks to exclude non-party witnesses from the courtroom. Both motions are granted.

Plaintiff's Motion No. 6 is not as straightforward as it appears at first glance, however. In response to Defendants' Motion No. 5, and despite his own motion arguing that all non-party witnesses be excluded from the courtroom during trial, Plaintiff argues that members of Gonzalez's estate – Pedro Gonzalez Jr., Linda Gonzalez, Margarita Gonzalez, Amanda Knighten, and Tambria Knighten – should be permitted to remain in the courtroom. FRE 615

provides for the exclusion of witnesses upon a party's request "so that they cannot hear other witnesses' testimony," except for "(a) a party who is a natural person; (b) an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney; (c) a person whose presence a party shows to be essential to presenting the party's claim or defense; or (d) a person authorized by statute to be present." Plaintiff Pedro Gonzalez Jr. may remain in the courtroom, as he is a named party in this case. The other members of Gonzalez's estate are not parties in this case, and Plaintiff has not established that they fall within another exception to FRE 615. They therefore are excluded from the courtroom prior to testifying. They may observe the trial following the conclusion of their testimony, but if they do so, they cannot testify in rebuttal. *See United States v. Tedder*, 403 F.3d 836, 840 (7th Cir. 2005) (affirming the trial judge's decision to prohibit a rebuttal witness who had observed the trial). These Gonzalez family members are not on Defendants' list as trial witnesses.

5.  **Motion No. 8 to bar references to Defendants' commendations, awards, complimentary history, or job evaluations.**

Plaintiff seeks to bar evidence of or references to any commendations, awards, complimentary history, or job evaluations Defendants may attempt to introduce as evidence of their good character. Defendants do not object to Plaintiff's motion, and it is granted in this respect. However, Defendants note that they will seek to introduce such evidence if Plaintiff opens the door by presenting evidence of civilian complaints, lawsuits, disciplinary proceedings, or other bad acts against Defendants. At trial, the Court will look carefully at the type of evidence Defendants seek to rebut and the evidence they seek to introduce as rebuttal. It is not a foregone conclusion that complimentary evidence is admissible to rebut any FRE 404(b) evidence Plaintiff might introduce.

6. **Motion No. 9 to bar evidence that Sgt. Olson purchased a new gun following the Gonzalez shooting.**

Plaintiff initially sought to bar evidence that Olson purchased a new gun following the Gonzalez shooting, but in his reply brief, concedes that the motion is premature. Plaintiff's Motion No. 9 thus is denied without prejudice.

7. **Motion No. 10 to bar evidence that Plaintiff's lawyer visited third-party witness Bridgette Gaters on the day after the Gonzalez shooting.**

Plaintiff seeks to bar evidence that his attorney(s) visited third-party witness Bridgette Gaters the day after the Gonzalez shooting. Plaintiff's motion is granted. Plaintiff's attorneys deny visiting Gaters that day and represent to the Court they were not even contacted about this case until well after the Gonzalez shooting. Though Gaters testified that someone visited her the day after the Gonzalez shooting, she could not confirm that it was, in fact, Plaintiff's attorney(s). In response to a leading question from defense counsel, all Gaters could say was, "I'm not sure. It was a law firm. I'm not sure if it was [Loevy & Loevy] because I think they had somebody else working for them. It might have been another law firm. I'm not for sure." ECF No. 278-1 at 2.

There is no foundation for this line of evidence, as Gaters' testimony is much too vague and ambiguous to support an inference that her visitor was from Loevy & Loevy. Even if Gaters was visited by a lawyer representing Plaintiff, there is nothing to suggest that is probative of anything in this case, including any alleged bias of the witness. The Court will not waste time on, or cause Plaintiff's counsel to become a witness in, a mini-trial on an issue with no probative value.

**8.      Motion No. 11 to bar reference to Defendants' financial inability to pay a judgment.**

Plaintiff's Motion No. 11 seeks to bar Defendants from referencing their financial inability to pay a judgment against them. Conversely, Defendants' Motion No. 8 seeks to bar any testimony or evidence that Defendants will be indemnified by the City of Chicago for any compensatory damages the jury may return against them. The Court addresses both of these motions together. Plaintiff's Motion No. 11 is denied, and Defendants' Motion No. 8 is granted in part and denied in part.

A defendant's financial condition is relevant to a jury's determination of whether to award a plaintiff punitive damages and how much to award. *Kemezy v. Peters*, 79 F.3d 33, 35-37 (7th Cir. 1996). Seventh Circuit Pattern Jury Instruction 7.24 also permits a jury to consider information about a defendant's financial condition on the issue of punitive damages in appropriate cases. The allegations in this case against Defendants, if proven, reasonably could give rise to an award of punitive damages against them and in favor of Plaintiff. Accordingly, Defendants are not barred from referencing their financial condition as it may relate to punitive damages. Plaintiff's Motion No. 11 is therefore denied.

In his reply brief, Plaintiff acknowledges that a party's financial condition is relevant for purposes of assessing punitive damages, and asks the Court to allow him to present evidence that any judgment against Defendants for compensatory damages will be paid by the City of Chicago or its insurers if Defendants plead poverty as to punitive damages at trial. Evidence of indemnification is generally inadmissible, so if Defendants do not plead poverty as to punitive damages, Plaintiff may not introduce evidence of indemnification for compensatory damages. But if Defendants plead poverty as to punitive damages, they open the door for Plaintiff to offer evidence of indemnification as to compensatory damages. *Betts v. City of Chicago*, 784

F.Supp.2d 1020, 1030-31 (N.D. Ill. 2011) ("[Plaintiff] is barred from . . . presenting any evidence or testimony that the defendants may be indemnified by the City of Chicago for damages. However, if the defendants plead poverty as to any damages, [plaintiff] may offer evidence of indemnification."). Defendants cannot argue poverty and avoid telling the jury that they are partially indemnified. Defendants' Motion No. 8 thus is granted in part and denied in part.

**9.** **Motion No. 12 to bar Defendants from conducting jury criminal background checks.**

Plaintiff next seeks to bar Defendants from conducting criminal background checks on potential jurors. Plaintiff's motion is granted. The propriety of whether a litigant can utilize law enforcement databases to conduct juror background checks is unsettled in this district. *See Dyson v. Szarzynski*, 2014 WL 7205591, at *2 (N.D. Ill. Dec. 18, 2014) (collecting cases). In *Dyson*, Magistrate Judge Kim expressed a number of concerns associated with permitting a litigant in a civil case to access police databases to perform background checks on potential jurors. Judge Kim noted that permitting juror background checks could foster an atmosphere of distrust between jurors and lawyers or even the court. *Id.* at *3. He noted the unfair imbalance in information available to police defendants, who have access to various databases plaintiffs may not. He also expressed concern with conferring a measure of judicial authority to the databases defendants may use to conduct juror background checks, noting that "it may appear that the court condones a use of technology for a purpose not intended by its designers." *Id.*

Judge Kim did not rule definitively on the issue in *Dyson* because the plaintiff there withdrew his objection to background checks of potential jurors, but the Court agrees with the cautionary concerns articulated in that case. Here, though Defendants argue that "the criminal history information of which Plaintiff complains is in the public domain," they propose to use CHRIS, "the Chicago Police Department's own system," to conduct whatever background

checks they will perform. ECF No. 258 at 17. Neither Plaintiff nor other litigants in run-of-the-mill civil cases have access to this database. Police defendants are not in a special position such that they should be able to use private databases to aid them in selecting a civil jury when others cannot, even if, as here, they propose to share their findings with a plaintiff.

Moreover, Chicago Police Department General Orders appear to limit use of these databases to "official police business." *See* G.O. 09-01-01, ECF No. 247-1 at 29 ("Access to information is restricted to official police business. Access of information for personal or other reasons is strictly prohibited."). Jury selection in a civil lawsuit against police officers is not "official police business" as it is commonly understood, *i.e.*, serving and protecting the public. And Defendants' asserted justification that jurors will lie about their criminal history or arrest record is not such a pervasive problem that it needs to be addressed by conducting criminal background checks on all jurors. Plaintiff's motion is granted.

**10.    Motion No. 13 to bar the use of undisclosed witnesses and those previously removed from Defendants' witness disclosures.**

Plaintiff's Motion No. 13 seeks to bar the use of a number of witnesses Defendants did not disclose to Plaintiff until Plaintiff received Defendants' witness list as part of the pretrial order. Defendants concede (or at least do not rebut Plaintiff's argument) that they did not disclose most of the witnesses who are the subject of Plaintiff's Motion No. 13 prior to submitting their witness list. Instead, Defendants assert that these witnesses will be called for impeachment only, and therefore they had no duty to disclose them under Federal Rule of Civil Procedure 26. Plaintiff's motion is granted in part and reserved in part.

Rule 26(a)(1) requires a party to disclose the name and contact information "of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely

for impeachment." FED. R. CIV. P. 26(a)(1). Rule 26(e) requires a party to supplement its Rule 26(a) disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect. . . ." FED. R. CIV. P. 26(e). Under Rule 37(c), if a party fails to identify a witness as required by Rule 36(a) or (e), the party cannot use that witness at trial unless the failure to disclose was harmless or substantially justified.

Defendants assert they will call Officers Johnson, Tatgenhurst, and Heintz to testify about tracing the firearm they say was recovered from Gonzalez. ECF No. 258 at 21. Though Defendants proffer this anticipated testimony as "impeachment," the Court agrees with Plaintiff that this testimony goes to the heart of Defendants' response to Plaintiff's long-known claim that police officers planted the gun they recovered at the scene of the Gonzalez shooting. Similarly, Defendants assert IPRA Investigator Alexis Amezaga will testify that she requested the latent prints taken from the recovered gun be compared to Defendants' prints, as Defendants are expected to testify that they handled the gun allegedly recovered from Gonzalez. This testimony appears to be part of Defendants' response to Plaintiff's argument that the police improperly handled the gun after the shooting. It is not strictly impeachment evidence.

Officers Johnson, Tatgenhurst, and Heintz and Investigator Amezaga are witnesses Defendants should have known would play a role in their theory of the case and, therefore, they should have been disclosed to Plaintiff well before the filing of the pretrial order. Their testimony is barred to the extent it goes to Defendants' case-in-chief and not to impeachment. *See Wilson v. AM General Corp.*, 167 F.3d 1114, 1122 (7th Cir. 1999) (affirming the district court's exclusion of witnesses where the defendant "should have known before the trial even began that these individuals could testify to [substantive facts]" and "should have named them in its mandatory disclosures").

Defendants assert Detective Balodimas will be called to impeach Ashley Bruno's testimony regarding the Jovany Diaz line-up. The Court reserves ruling on Detective Balodimas until it hears how Bruno testifies at trial, if she is called to testify.

Plaintiff next seeks to exclude Detective Alvarez from testifying at trial. Defendants point out that they did disclose Detective Alvarez in their Rule 26(a)(1) disclosures, but Plaintiff asserts the disclosure was too vague to be meaningful. The disclosure lists Detective Alvarez as one of dozens of officers with the description, "regarding involvement with incident of this lawsuit." *See* ECF No. 278-2 at 3. Defendants maintain they may need to call Detective Alvarez to impeach witness Marisol Lopez's expected testimony that she never gave a statement to the police about the Gonzalez shooting. The Court reserves ruling until it hears if, and how, Lopez testifies. If Lopez testifies she never gave a statement to police, Detective Alvarez may impeach that testimony. The Court will pay close attention to any more substantive testimony about the police investigation or the shooting that should have been disclosed in Defendants' Rule 26(a)(1) disclosures.

Plaintiff's motion is granted as it relates to Officers Stack, Gade, Zoto, Corona, and Gonzalez; Internal Affairs Agent Mullings; and Lieutenant Masters. Defendants intended to call these witnesses to impeach Plaintiff's proposed FRE 404(b) witnesses. As the Court has granted Defendants' Motion No. 34 to bar Plaintiff's proposed FRE 404(b) witnesses (*see* discussion *infra* Section II, Defendants' Motion No. 34), there is no reason for Defendants to call their own witnesses for impeachment purposes.

## 11. Motion No. 14 to bar opinion testimony from Julie Wessell.

Plaintiff's final motion seeks to bar certain opinion testimony from Julie Wessell, a forensic scientist for the Illinois State Police who conducted the fingerprint analysis of the gun

allegedly recovered from Gonzalez. Plaintiff seeks to bar Wessell from testifying "beyond the facts of her course of analysis of the gun in question." ECF No. 253 at 7. Plaintiff's motion is denied.

Plaintiff deposed Wessell on October 26, 2012, during fact discovery. On August 15, 2013, Defendants served a Federal Rule of Civil Procedure 26(a)(2)(C) disclosure containing opinions from Wessell that Plaintiff asserts are "a slew of other expert testimony and expert conclusions that go far beyond the scope of her involvement in the case." ECF No. 253 at 4. In particular, Plaintiff takes issue with Wessell's Rule 26(a)(2)(C) opinions that it is not unusual for an object to be recovered and tested, with the result being that there are no prints suitable for comparison; and that one cannot conclude that Gonzalez did not hold the gun despite the lack of fingerprints suitable for comparison. Plaintiff argues that Wessell was required to submit an expert report pursuant to Rule 26(a)(2)(B) in order to offer these opinions, and because she never did so, Defendants are now barred from eliciting these opinions at trial. The Court disagrees.

At the outset, the Court notes Defendants disclosed Wessell as a Rule 26(a)(2)(C) expert on August 15, 2013, well before the November 7, 2013 deadline for doing so. Plaintiff had until January 31, 2014 – more than five months after Defendants disclosed Wessell's proffered opinions – to depose Wessell and inquire about her opinions. ECF No. 200. Alternatively, Plaintiff could have moved to strike Wessell as a Rule 26(a)(2)(C) expert and required a Rule 26(a)(2)(B) report. Plaintiff did neither and did not raise issue with Wessell's long-disclosed opinions until filing his motions *in limine*. The Court will not reward Plaintiff for sitting on his rights and failing to raise an issue that could easily have been addressed in a timely manner. Plaintiff sufficiently was put on notice of Wessell's proffered opinions. Any error Defendants

may have committed in failing to provide an expert report pursuant to Rule 26(a)(2)(B) therefore was harmless because it easily could have been cured.

In any event, the Court disagrees with Plaintiff that Wessell was required to provide an expert report and instead finds Wessell to be a proper Rule 26(a)(2)(C) witness. Seventh Circuit case law is clear that formal disclosure of expert witnesses is required for both Rule 26(a)(2)(B) experts and Rule 26(a)(2)(C) experts. *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757-58 (7th Cir. 2004). The difference lies in what each expert is required to disclose. Under Rule 26(a)(2)(B), expert witnesses who are "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony" are required to submit a detailed expert report. FED. R. CIV. P. 26(a)(2)(B). Under Rule 26(a)(2)(C), however, expert witnesses who do not fall within one of those categories are generally not required to submit an expert report. FED. R. CIV. P. 26(a)(2)(C). Instead, a Rule 26(a)(2)(C) witness need only provide a disclosure stating the subject matter on which she is expected to present evidence and a summary of the facts and opinions to which she is expected to testify. *Id.*

Plaintiff does not argue that Wessell falls within any of the categories of expert witnesses listed in Rule 26(a)(2)(B). Instead, Plaintiff relies on *Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729 (7th Cir. 2010), to argue that Wessell is a *de facto* Rule 26(a)(2)(B) expert because some of the opinions contained in her Rule 26(a)(2)(C) disclosure "go far beyond the scope of her involvement in the case." ECF No. 253 at 4. In *Meyers*, the Seventh Circuit ruled that a treating physician who formed an opinion as to the cause of the plaintiff's injury that was not formed as part of the physician's treatment of the plaintiff should have been deemed a retained expert who was therefore required to provide an expert report. *Meyers*, 619 F.3d at 734-35.

That is not the situation here. The opinions contained in Wessell's Rule 26(a)(2)(C) disclosure seem to follow from her examination and testing of the gun that allegedly was recovered from Gonzalez in that they explain what the results of her testing mean and do not mean. They are not isolated opinions formulated for the purpose of litigation, but rather, they expound on issues that are within the scope of Wessell's involvement in this case. Plaintiff's motion is denied.

## II. Defendants' Motions *in Limine*

Defendants' Motions No. 10, 13, 15, 20, and 27 are agreed and therefore granted. Defendants' Motions No. 2, 4, 5, 9, 11, 12, 18, 25, 30, and 34 are granted. Defendants' Motions No. 1, 7, 8, 22, 23, 29, and 35 are granted in part and denied in part. Defendants' Motion No. 24 is granted in part and taken under advisement in part. Defendants' Motions No. 3, 6, 14, 16, 17, 21, 26, and 31 are denied. Defendants' Motion No. 19 is denied in part and taken under advisement in part. Defendants' Motions No. 28, 32, and 33 are taken under advisement. The Court's rulings on these motions are set forth in more detail below.

1.     **Motion No. 1 to bar evidence or argument that Defendants' decision to stop Gonzalez for investigative purposes prior to the shooting was improper or illegal.**

Defendants first seek to bar any evidence or argument from Plaintiff that their decision to make an investigatory stop of Gonzalez prior to the shooting was improper or illegal. Defendants' motion is granted in part and denied in part. The legal issue to be decided in this case is whether Defendants used excessive force when they shot and killed Gonzalez, not whether the investigatory stop (or attempted stop) was lawful. Defendants' attempted stop of Gonzalez before shooting him and the shooting itself are different events. Whether the initial stop was lawful is not relevant to whether Defendants' use of deadly force was constitutionally permissible sometime later. Any argument Plaintiff may make relating to the legality of the initial stop thus is barred unless Defendants open the door.

Plaintiff may, however, question whether Defendants had some reason to stop or seek an interview with Gonzalez without arguing that the attempted stop was illegal. The facts that led Defendants to pursue Gonzalez are relevant to Defendants' state of mind and decision to use force. Plaintiff is entitled to introduce evidence in support of his version of the facts surrounding the shooting and, to the extent Defendants are going to testify about what they saw and did immediately before Gonzalez was shot, Plaintiff is entitled to question the credibility of that testimony.

2.    **Motion No. 2 to bar argument that Defendants, other police personnel, or emergency personnel failed to provide timely and adequate medical care to Gonzalez.**

Defendants' motion is granted. There is no claim that a delay in or denial of medical care contributed to Gonzalez's death, and Plaintiff has not asserted a legal claim for the delay or denial of such care. Nor is Plaintiff's argument that such evidence supports an inference that Defendants wanted Gonzalez dead so that he could not be a witness to what happened persuasive. Plaintiff's argument is speculative at best, as Plaintiff cites no other evidence supporting this theory and, in any event, there apparently were a number of people on the street who will testify about their observation of Defendants' encounter with Gonzalez. Those witnesses' testimony is arguably more credible on whether Gonzalez had a gun than Gonzalez's testimony would have been as the person who allegedly pointed a gun at Defendants. Any argument that Defendants or other emergency personnel failed to provide adequate medical care to Gonzalez is not very probative of whether Gonzalez pointed a gun at Defendants and any minimal value it has to the purported theory Plaintiff advances is outweighed by the potential for confusion.

**3.      Motion No. 3 to bar any mention of the unrelated traffic stop prior to the shooting.**

Olson testified during his deposition that Defendants' shift began at 3:30 p.m. the day of

the Gonzalez shooting and that, sometime between the start of the shift and the shooting,

Defendants got gas and made a brief traffic stop.  ECF No. 259-1 at 23.  Defendants seek to bar

as irrelevant any mention of the traffic stop because it did not involve any parties in this case.

The motion is denied.  It is proper for Plaintiff to inquire about the chronology of events during

the afternoon and early evening leading up to the shooting.  Plaintiff asserts the shooting

occurred at 4:50 p.m. and that at least one eyewitness will testify that Defendants were circling

the area for a while before encountering Gonzalez.  Defendants' testimony that they got gas and

made a traffic stop during the hour and a quarter between the time they began their shift and their

encounter with Gonzalez is relevant to Defendants' credibility regarding the chronology of

events leading up to the shooting.

**4.      Motion No. 4 to bar evidence that any Chicago police officer allegedly visited the
         memorial for Gonzalez and/or apologized after the shooting.**

Defendants' Motion No. 4 seeks to bar evidence that any Chicago police officers visited

Gonzalez's memorial a day or two after the shooting, apologized, and attempted to leave flowers.

The motion is granted.  Defendants' motion asserts that during her deposition, third-party

witness Ashley Bruno testified that an officer "was apologizing and engaged in a heated

discussion with an unknown male at the memorial."  ECF No. 240 at 6.  According to

Defendants, Bruno testified that she did not overhear this apology and discussion herself, but

rather, she heard about it from an unknown individual.  (The relevant portion of Bruno's

deposition testimony is not attached as an exhibit to Defendants' motion or Plaintiff's response.)

Defendants argue this is double hearsay.  Plaintiff did not address this portion of Defendants'

Motion No. 4 and presumably does not object to excluding evidence of any such conversation.

Even if Plaintiff did object, Defendants are correct that the alleged statement is inadmissible hearsay. The motion is granted to the extent it seeks to bar Bruno from testifying she heard from an unidentified third person that an unknown officer apologized to some other unknown individual at the memorial for Gonzalez.

The motion also is granted to the extent it seeks to bar Bruno's testimony that she saw a Defendant officer place flowers at the memorial for Gonzalez. The parties disagree on whether Bruno reliably identified any of the Defendants as the officer who purportedly placed flowers at the memorial. Bruno's deposition testimony is somewhat ambiguous on this point. If Bruno cannot reliably identify any Defendant as the individual who placed flowers at Gonzalez's memorial, her testimony that she saw someone place flowers at the memorial certainly would be inadmissible, as it would be completely irrelevant.

Even assuming Bruno is able to identify a Defendant as the flower bearer, however, the testimony still is inadmissible. Plaintiff, relying on *United States v. Samaniego*, 345 F.3d 1280 (11th Cir. 2003), argues that placing flowers at a memorial is an apology and, as such, is admissible as a "classic admission of guilt." ECF No. 259 at 9. This case is entirely distinguishable from *Samaniego*. In that case, the declarant, in front of a number of other witnesses, admitted to theft, orally apologized for his actions, and asked for forgiveness. *Samaniego*, 345 F.3d at 1282-83. Nothing of the sort occurred here. The Court disagrees with Plaintiff's assertion that placing flowers at a memorial is synonymous with apologizing for shooting Gonzalez. It is entirely irrelevant to the question of whether Defendants' use of deadly force was constitutionally reasonable. The motion is granted.

**5.     Motion No. 5 to bar witnesses from the courtroom.**

Defendants' motion is granted. *See* discussion *supra* Section I, Plaintiff's Motion No. 6.

**6. Motion No. 6 to bar Plaintiff from arguing or eliciting testimony that the City of Chicago improperly trains, disciplines, monitors, or controls police officers.**

Defendants seek to bar Plaintiff from arguing or eliciting testimony that the City of Chicago improperly or deficiently trains, disciplines, monitors, or controls its police officers, arguing that, because Plaintiff withdrew his *Monell* claim (ECF No. 185), any such evidence is irrelevant, highly prejudicial, and likely to confuse the jury. Defendants' motion is overbroad in that it is not specific with respect to the evidence to which it is directed. It is denied without prejudice. *See, e.g.*, *Hill v. City of Chicago*, 2011 WL 3205304, at *4 (N.D. Ill. Jul. 28, 2011) (denying without prejudice defendants' motion *in limine* that did not articulate with specificity what documents defendants sought to exclude in the context of a dismissal of the plaintiff's *Brady* claim, because the dismissal did not necessarily mean that all *Brady* evidence was inadmissible).

In light of Plaintiff withdrawing his *Monell* claim, however, the Court agrees with Defendants that evidence of the City's failure to properly train, monitor, discipline, and/or control its police officers generally is inadmissible. Plaintiff's arguments in response to Defendants' motion do not support an argument that such evidence is relevant to or probative of any issue in this case. Plaintiff says, for example, that the investigation into the Gonzalez shooting is rife with false statements that Defendants may attempt to attribute to third-party witnesses, and that a lack of oversight created opportunities for Defendants themselves to fabricate evidence related to the shooting. Evidence of how the City trains, disciplines, or supervises its police officers is not the antidote to any alleged false statements or fabricated evidence. It is collateral evidence that is far afield and irrelevant in this case. Accordingly, while the motion is denied without prejudice as overbroad, the Court is not inclined to admit evidence of the City's training, monitoring, disciplining, and/or controlling of its police officers

unless Plaintiff presents a theory to support the admissibility of such evidence that addresses the above concerns.

7.      **Motion No. 7 to bar any testimony, evidence, or argument regarding CPD General Orders or other policies and procedures.**

Defendants' Motion No. 7 suffers the same flaw as Defendants' Motion No. 6 – namely, it also is overbroad – and therefore is granted in part and denied without prejudice in part. Defendants seek to bar introduction of Chicago Police Department ("CPD") General Orders or some other unspecified policies and procedures. Violations of CPD General Orders and local laws and regulations shed no light on whether an officer's behavior is "objectively reasonable" in the constitutional context. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). Stated differently, "the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." *Id.* at 455. Thus, any attempt to use violations of CPD General Orders or other policies and procedures as prima facie evidence of a constitutional violation is prohibited.

But there may be other circumstances in which this kind of evidence is admissible. Central to Plaintiff's theory of the case, for example, is that Defendants and other officers did not properly handle the gun purportedly recovered from Gonzalez after the shooting. Evidence of CPD General Orders or other policies and procedures may be relevant to that inquiry. Thus, at this juncture, the Court is not inclined to bar all such evidence. The Court notes, however, that the proponent of such evidence carries a heavy burden under FRE 401 and 403. *Ratliff v. City of Chicago*, 2012 WL 5845551, at *3 (N.D. Ill. Nov. 19, 2012). Additionally, should either party seek to introduce evidence or argument regarding CPD General Orders or other policies or procedures, counsel must notify the Court and opposing counsel outside the presence of the jury and with sufficient advance notice to permit analysis under FRE 401, 403, and Seventh Circuit or

Illinois case law. *Id.* The parties should be prepared to address this issue at the pretrial conference, and Plaintiff should identify, if he can, the CPD General Orders, policies, and procedures he wants to introduce.

**8.** **Motion No. 8 to bar testimony or evidence suggesting Defendants may be indemnified by the City of Chicago for any compensatory damages returned against them.**

Defendants' motion is granted in part and denied in part. *See* discussion *supra* Section I, Plaintiff's Motion No. 11.

**9.** **Motion No. 9 to bar the argument that the jury should send the City of Chicago a message or punish the City with its verdict.**

Defendants next move to bar Plaintiff from arguing that the jury should "send a message" to, or somehow punish, the City of Chicago with its verdict. Defendants' motion is granted. Plaintiff agrees that arguments about punishing the City of Chicago, or sending a message to the City and/or its citizens, are improper here because Plaintiff cannot recover punitive damages from the City in this case. Accordingly, any such arguments are barred. Plaintiff argues, however, that since he can recover punitive damages from the individual Defendants, any argument that the jury should send a message to or punish the individual Defendants is proper. The Court's ruling does not bar Plaintiff from making this argument, if done properly. Plaintiff may ask for a message, in the form of punitive damages, as to the individual Defendants, but he cannot ask for or imply he is entitled to punitive damages from the City. *See Betts v. City of Chicago*, 784 F.Supp.2d 1020, 1033 (N.D. Ill. 2011).

**10.** **Defendants' Motion No. 11 to bar any mention of the Special Operations Section.**

Defendants' motion to bar reference to the Special Operations Section ("SOS") of the Chicago Police Department is granted. The SOS was disbanded in 2007, four years before the Gonzalez shooting, following "one of the department's worst misconduct scandals." David

Heinzmann and Annie Sweeney, *Federal prosecutors say 4 Chicago police officers from elite SOS unit will plead guilty*, CHICAGO TRIBUNE, Apr. 7, 2011, http://articles.chicagotribune.com/2011-04-07/news/ct-met-sos-chicago-police-charges-20110407_1_federal-charges-civil-rights-charges-finnigan-and-other-officers. The scandal received extensive media coverage and resulted in criminal charges against multiple officers. Though certain Defendants and police officer witnesses in this case were or may have once been members of the SOS, there is no evidence that they were implicated in any wrongdoing as members of that unit. Associating them with the SOS has no probative value here and, given the notoriety of that unit, any association with the SOS could be unfairly prejudicial to Defendants. Plaintiff may explore Defendants' and other police officer witnesses' prior work history without mentioning the SOS by name.

11. **Motion No. 12 to bar testimony, argument, or suggestions that police officers in general act in a certain manner.**

Defendants' Motion No. 12 seeks to bar any argument or evidence regarding the conduct of or reputation of police officers in general, including that police officers engage in cover-ups, lie for their colleagues, use threatening or abusive behavior, shoot citizens without justification, and engage in a code of silence. Plaintiff argues that Defendants' motion is overbroad, but in their reply, Defendants specify that they "do not seek to preclude Plaintiff from exploring or arguing that *these* officers are biased as to each other in *this* case." ECF No. 273 at 11 (emphasis in original). Rather, Defendants seek to bar Plaintiff from making broad accusations about police officers in general.

The motion is granted. "[G]eneralized allegations – separate and apart from what may be true of the officers named as Defendants here – are not helpful and are akin to impermissible propensity evidence." *Ratliff*, 2012 WL 5845551, at *4 (citations omitted). The Court will not

permit Plaintiff to elicit testimony concerning generalizations about police officers that have nothing to do with the police officers involved in this particular case. Accusations and innuendo about police officers in general is unduly prejudicial and irrelevant to whether these particular officers used excessive force when they shot Gonzalez.

With that said, however, the Court notes that Plaintiff's theory of the case is that the gun recovered from Gonzalez's body was planted on him after the shooting. To that end, Plaintiff may explore the possibility that Defendants and other officers in this case attempted to cover up the allegedly wrongful conduct at issue here. Cross-examination about loyalty to other Defendants and police officers involved in this case also is proper as to possible witness bias. There may be additional situations in which it is proper for Plaintiff to introduce evidence of the conduct of police officers involved in this case, and that evidence may be admissible. Any objections Defendants may have to this sort of questioning will be made in the context of trial.

**12.  Motion No. 14 to bar any testimony, evidence, or argument that police were involved in a conspiracy and Motion No. 16 to bar any comment in opening statement that any officers attempted to cover up or conceal misconduct in this case.**

Defendants' Motions No. 14 and 16 both seek to exclude evidence, argument, or comment relating to a "conspiracy" or a "cover up." The motions are denied. Defendants argue that Plaintiff should be barred from introducing evidence of, or referencing, a conspiracy because Plaintiff did not plead a conspiracy claim. District courts routinely have found this argument unconvincing. *See, e.g., Hillard v. City of Chicago*, 2010 WL 1664941, at *3 (N.D. Ill. Apr. 23, 2010); *Galvan v. Nordberg*, 2006 WL 1343680, at *2-3 (N.D. Ill. May 10, 2006); *Saunders v. City of Chicago*, 320 F.Supp.2d 735, 740 (N.D. Ill. 2004). Even absent a conspiracy claim, Plaintiff is entitled to some leeway in arguing that Defendants' conduct indicates or suggests they are covering up wrongdoing by a fellow officer. *Hillard*, 2010 WL 1664941, at *3. To the

extent Defendants are concerned with the use of the word "conspiracy," the Court directs Plaintiff to instead speak in terms of a "cover-up," a "concerted effort to cover up," or similar terminology.

Defendants also argue that whether officers engaged in misconduct or falsified police reports after the shooting has no relevance to whether Defendants violated Gonzalez's constitutional rights. This argument also is unconvincing. Such evidence can go to, for example, witness bias or motivation. *Galvan*, 2006 WL 1343680, at *2-3. It may affect the weight the jury gives to police reports or officers' testimony. *Saunders*, 320 F.Supp.2d at 740. It may go to Defendants' and other officers' state of mind. Plaintiff's case theory is that Defendants and other police officers engaged in a cover-up when they placed a "drop gun" at the scene of the shooting. Plaintiff has pointed to at least some evidence – such as the handling of the gun recovered from Gonzalez post-shooting and multiple telephone conversations between Defendants and other police officers immediately post-shooting – to support that theory. He is entitled to present his theory to the jury.

### 13. Motion No. 17 to bar any alleged post-shooting statements or offensive actions by non-defendant City employees.

Defendants' Motion No. 17 seeks to bar testimony "regarding the conduct of unidentified police officers at the scene, hospital, and police station after the shooting." ECF No. 240 at 18. The category of evidence Defendants seek to exclude in Motion No. 17 is long and unspecific, "including, but not limited to, using offensive and/or threatening language or gestures; preventing access to the crime scene; preventing the family access to the decedent; pointing weapons at bystanders to the crime scene; and holding a witness against his will at the police station; as well as . . . commentary on the general manner in which the crime scene was investigated and/or preserved." *Id.* The motion is denied without prejudice as overbroad. The

Court will rule on objections to specific lines of questioning in the context of trial. If there is something specific Defendants want to raise at the pretrial conference, they should do so.

The Court notes that if Plaintiff intends to introduce evidence of the type of post-shooting activity named in Defendants' motion, he must have a valid reason for doing so. District courts in this Circuit have noted that reference to certain post-incident activities in Section 1983 cases can be unfairly prejudicial under FRE 403. *See, e.g.*, *Beckham v. Stiles*, 2009 WL 3336096, at *3-4 (E.D. Wisc. Oct. 15, 2009) (excluding videos of officers' interactions with Section 1983 plaintiff and third-party witness following alleged excessive force). Such activity also has limited relevance to liability, which hinges on whether Defendants' use of force (*i.e.*, shooting Gonzalez) was "objectively reasonable under the circumstances." *Thompson*, 472 F.3d at 454 (citations omitted). Nor does it have any relevance to punitive damages, which instead will be based on the shooting itself. Thus, while the motion is denied as overbroad, the Court will not permit Plaintiff to introduce a wide range of post-shooting evidence absent good reason. Again, if Plaintiff has something particular in mind, it should be raised at the pretrial conference.

### 14. Motion No. 18 to bar argument or testimony that Defendants' alleged misconduct was racially motivated.

Defendants seek to exclude evidence that a neighbor heard a police officer yell, "I'm going to get you nigger" as officers were chasing Gonzalez down Hirsch Street before the first shots were fired at him. Defendants argue this evidence is inadmissible because it is irrelevant to Plaintiff's excessive force claim and because it is highly inflammatory and more prejudicial than probative on the question of whether the Defendant officers used excessive force against Gonzalez. Plaintiff contends that the statement is an admission by a party opponent under FRE 801(d)(2). Plaintiff says he does not intend to "make the trial all about race" but argues that the statement made by an unidentified police officer is admissible because it was made just moments

before witnesses heard the first shots fired at Gonzalez, when even Defendants admit he was not pointing a gun at anyone. ECF No. 259 at 35.

The Court agrees with Defendants that this statement made by an unidentified officer is not admissible. Even if Plaintiff could identify who made the statement, which he has not done and apparently cannot do, the statement is much more prejudicial than probative of anything the jury must determine in this case. Plaintiff does not allege that the shooting was racially motivated. In his brief response to Defendants' motion, Plaintiff does not identify any element of his case to which this alleged racial epithet yelled by an unknown police officer is arguably relevant. Defendants' motion is granted.

15.     **Motion No. 19 to bar Plaintiff's counsel from treating every non-defendant City of Chicago employee as an adverse witness.**

Defendants seek to bar Plaintiff's counsel from treating every non-defendant City of Chicago employee as an adverse witness. The motion is denied in part and taken under advisement in part. FRE 611(c) instructs that leading questions generally are not desirable on direct examination, but that they may be proper on direct examination "when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." FED. R. EVID. 611(c). "A classic example of a witness identified with an adverse party is a police officer called as a witness in a § 1983 trial involving an incident in which he or fellow officers were involved." *Ratliff*, 2013 WL 3388745, at *7. The Court will permit Plaintiff to treat CPD employees and other City of Chicago employee witnesses who were involved in the investigation of the Gonzalez shooting as adverse witnesses. In that regard, Defendants' motion is denied.

Defendants' motion is taken under advisement to the extent Plaintiff intends to call as a witness any non-police officer City of Chicago employee who was not involved in investigating the shooting. Neither party has identified with any specificity the nature of any non-defendant,

non-police officer City of Chicago employee's testimony. If Plaintiff intends to call such a witness and treat him or her as adverse, Plaintiff should be prepared to identify that witness and the substance of the witness's testimony at the pretrial conference.

16.     **Motion No. 20 to bar Plaintiff's counsel from requesting documents or commenting on discovery in the presence of the jury.**

Defendants move to bar Plaintiff's counsel from asking Defendants to produce information or documents in the presence of the jury and from commenting on Defendants' diligence during the discovery process in the presence of the jury. The motion is granted as agreed. Plaintiff reserves the right to bring any such issues to the Court's attention outside the presence of the jury if they become relevant during the trial.

17.     **Motion No. 21 to bar argument or inference that Gonzalez is unable to give his version of events.**

Defendants seek to bar Plaintiff from arguing that Gonzalez is unable to give his version of events, that Defendants killed the only other witness, or similar arguments. The motion is denied. Defendants correctly point out that "the jury will be well aware" that one or more Defendants shot and killed Gonzalez. ECF No. 240 at 22. It is obvious Gonzalez cannot tell his version of what happened. Defendants, therefore, are not prejudiced if Plaintiff comments on that point.

18.     **Motion No. 22 to bar statements that Defendants should have shot to injure or used less forceful means than deadly force.**

Defendants seek to bar any evidence, argument, or insinuation that Defendants should have used means other than deadly force to stop Gonzalez and/or protect themselves from injury. Plaintiff responds that he does not intend to argue that Defendants should not have used deadly force if Gonzalez pointed a gun at them. Plaintiff does intend to argue, however, that if the jury does not believe Defendants' version of the facts and, instead, believes that Gonzalez ran from

34

the police but did not point a gun at them, then the jury may conclude that some amount of force less than deadly force was reasonable.

This dispute goes to the heart of the case. The law in this Circuit is that

[a]n officer may use deadly force when a reasonable officer, under the same circumstances, would believe that the suspect's actions placed him or others in the immediate vicinity in imminent danger of death or serious bodily harm. It is not necessary that this danger actually existed. An officer is not required to use all practical alternatives to avoid a situation where deadly force is justified.

Seventh Circuit Pattern Jury Instruction No. 7.09. Plaintiff acknowledges that, if Gonzalez pointed a gun at Defendants, the use of deadly force was not a constitutional violation. Plaintiff, therefore, has agreed not to put on evidence or argue that Defendants should have used less than deadly force if Gonzalez did, in fact, point a gun at them. Accordingly, Defendants' motion is granted in this respect without opposition.

Defendants' motion is denied in all other respects, however. Plaintiff can argue that Gonzalez did not point a gun at the Defendant officers and/or that it was not reasonable for them to believe he did so. Under those circumstances, Plaintiff can argue that even if some amount of force was or would have been reasonable under the circumstances, deadly force was not permitted or justified.

Defendants' motion therefore is granted in part and denied in part.

**19.    Motion No. 23 to bar introduction of any evidence or argument regarding the IPRA investigation of the shooting.**

Defendants move *in limine* to bar any evidence or argument regarding the IPRA investigation of the shooting. Plaintiff does not oppose Defendants' motion to the extent it seeks to bar evidence of any conclusions reached by IPRA, but Plaintiff opposes the motion on other grounds, arguing that there are valid reasons to introduce other parts of the investigation. For example, Plaintiff argues that Defendants' statements during the IPRA investigation can be used

as party admissions or for impeachment. Plaintiff also argues that, to the extent Defendants seek to impeach the testimony of third-party witnesses with prior inconsistent statements made to IPRA investigators, Plaintiff should be allowed to show that the investigation was biased or deficient for some other reason.

The Court agrees that evidence concerning any conclusion reached as a result of the IPRA investigation is not relevant to or probative of anything the jury must determine. In that regard, Defendants' motion is granted. Prior statements made as part of the IPRA investigation may be used for impeachment or as a party admission when appropriate. In that regard, the motion is denied. The Court agrees with Defendants, however, that it is unnecessary to elicit testimony that a prior statement was made as part of an IPRA investigation when impeaching the witness or offering a statement as a party admission. The potential prejudice from such testimony substantially outweighs what limited probative value it might have. A witness can be asked about a prior IPRA investigation statement in a more neutral way (for example, "you gave a statement under oath on [date], didn't you?"). To this extent, then, Defendants' motion is granted. Neither Plaintiff nor Defendants should elicit testimony concerning the IPRA investigation in this context.

The Court is wary of, and disagrees with, Plaintiff's broader argument that he should be allowed to show the IPRA investigation was biased or otherwise deficient if or when Defendants attempt to use records from the IPRA investigation to impeach third-party witnesses. The Court will not permit a "trial" of the IPRA investigation within the context of the trial in this case concerning Plaintiff's claims against the three police officer Defendants. To the extent Plaintiff wants to introduce specific evidence of what a particular investigator said, did, or did not do in connection with a witness interview or the handling or processing of evidence during a post-

shooting investigation by IPRA or the CPD for a particular purpose, the Court will consider such argument at the pretrial conference. Accordingly, the balance of Defendants' motion is denied without prejudice to the extent Plaintiff has particular evidence he wants to introduce in relation to a particular witness or evidence and the Court rules that evidence is admissible. Even in this regard, however, it should be possible to introduce such evidence without reference to the IPRA investigation *per se*.

The Court notes that Defendants do not object to Plaintiff's intention to introduce evidence that Defendants Olson, Motyka, and Tunzi, as well as other police officers, called each other on their cell phones immediately after the shooting, before any officer spoke to an IPRA or CPD investigator and before they filled out their Tactical Response Reports. Plaintiff alleges that these conversations were used to shape the officers' story of the events that led to the shooting. Nothing in the Court's ruling on Defendants' Motion No. 23 prevents Plaintiff from being able to present fully this theory of the case. It is irrelevant for this trial whether Defendants and other officers may have shaped their story in preparation of an IPRA investigation, an internal investigation, an ensuing lawsuit, or for some other reason.

The Court will discuss further with counsel at the pretrial conference the ground rules for eliciting and referencing this kind of evidence.

**20.     Motion No. 24 to bar any criticism of the police investigation of the shooting.**

Defendants' Motion No. 24 seeks to bar criticism of the CPD's investigation of the shooting. For the same reasons set forth in the Court's discussion of Defendants' Motion No. 23, *supra*, the motion is granted in part and taken under advisement in part. Plaintiff may not introduce any conclusions reached as a result of the CPD investigation or distract the jury with a mini-trial on the merits of the CPD investigation. To the extent Plaintiff argues more specifically

in response to this motion that he should be able to introduce evidence that the police mishandled the gun they say Gonzalez was holding, such evidence may be admissible. Plaintiff should address at the pretrial conference what evidence he intends to introduce to show that "[a]s a direct result of the deliberate mishandling [of the gun after the shooting], there were no fingerprints recovered when the Illinois State Police tested it." ECF No. 259 at 44.

21. **Motion No. 25 to bar reference to the Fraternal Order of Police disclaimer.**

Defendants seek to bar reference to the Fraternal Order of Police disclaimer Defendants and other officers used in their statements to IPRA investigators following the shooting. The motion is granted. Lodge No. 7 of the Fraternal Order of Police, the bargaining unit for officers in the CPD, instructs its members to make a standard disclaimer when completing reports or giving statements related to internal investigations. ECF No. 240 at 28. The disclaimer is irrelevant to the veracity of any assertions made in the IPRA proceedings. *Robinson v. City of Chicago*, 2013 WL 3716651, at *2 (N.D. Ill. Jul. 15, 2013) ("there is no evidence that the disclaimer affects the veracity of an officer's statement, or that its inclusion would lead them to make false statements or claims with respect to this incident"). The disclaimer, as a standard statement given at the direction of the police union, also has little probative value in light of the great risk of unfair prejudice it poses. *Id.* (citing *Obrycka v. City of Chicago*, 2012 WL 4060293 (N.D. Ill. Sept. 14, 2012)).

22. **Motion No. 26 to bar mention of Sgt. Olson taking photographs or video of Stevie Blockson during Blockson's deposition.**

Defendant Olson attended the deposition of witness Stevie Blockson. During the deposition, Olson recorded a portion of Blockson's testimony with his cell phone. When Plaintiff's counsel realized Olson was recording the deposition, the following exchange occurred:

Plaintiff's counsel: Actually, at this time are you taking a picture or are you recording this?

Olson: No. I was trying to text message.

Plaintiff's counsel: Why is the light on on your camera?

Olson: I just got this phone. I'm not that familiar with it.

Blockson: Don't put no picture of me.

ECF No. 259-1 at 63-64. Thereafter, a discussion was held off the record. When the parties went back on the record, Plaintiff's counsel represented that Olson deleted the video in her presence, and Defendant's counsel stated the video recording was unintentional.

Blockson did not believe the recording was unintentional. ECF No. 259-1 at 63. Defendants concede Blockson "was upset by the incident." ECF No. 240 at 30. Indeed, after the incident, Blockson stated, among other things, "I don't need nobody harassing me" and "What you going to do, stalk me?" ECF No. 259-1 at 65-66. Defendants now seek to bar evidence of the recording, arguing that the recording was inadvertent and irrelevant to the issues to be decided, and that its admission would be unduly prejudicial. Plaintiff maintains that the purpose and effect of Olson's recording was to intimidate Blockson, a witness in this case, and that such evidence is admissible.

Defendants' motion is denied. A defendant's attempt to intimidate a potential witness is probative of his consciousness of guilt, and FRE 404(b) ordinarily does not bar such evidence. *United States v. Mokol*, 646 F.3d 479, 483 (7th Cir. 2011) (citations omitted). Blockson, if he testifies at trial, can say Olson took a video of him during the deposition. Defense counsel can bring out in cross-examination that Olson said it was a mistake, FRE 801(d)(1)(B), and Olson also can testify as much at trial. Whether Olson's recording was intentional or not is a question for the jury to decide, and if the jury finds the recording to be intentional, it potentially is

probative of Olson's consciousness of guilt. *See United States v. Johnson*, 624 F.3d 815, 821 (7th Cir. 2010) (no error when trial court allowed the jury to consider whether the defendant's behavior amounted to witness intimidation). It is relevant, probative, and not unduly prejudicial.

**23.    Motion No. 28 to bar mention of the M-4 carbine rifle in P.O. Motyka's trunk.**

Defendants next seek to bar any evidence that Defendant Motyka had an M-4 Carbine rifle in his trunk the day of the shooting. The motion is taken under advisement. Defendants argue that the existence of the rifle is unduly prejudicial and irrelevant to this case because there is no evidence it was removed from the trunk the day of the shooting. Plaintiff, however, responds that at least two witnesses testified they saw an officer with a rifle immediately after the shooting. According to Plaintiff, this evidence is relevant because it figures into the location of the officers after the shooting, which has important ramifications for other issues in the case. The Court does not understand this argument fully and, therefore, Plaintiff should be prepared to expound on his relevance theory at the pretrial conference.

**24.    Motion No. 29 to bar allegations of unrelated prior or post-incident police misconduct against certain witnesses.**

Defendants seek in Motion No. 29 to bar witnesses from testifying about interactions they have had with police officers before and/or after the shooting. Defendants' motion is granted in part and denied in part. Defendants first move to bar Ashley Bruno from testifying that she was held by police without cause while she was nine months pregnant and told she would be forced to have her child in jail if she did not give the arresting officers a gun. Defendants argue this line of testimony is irrelevant and unduly prejudicial. Plaintiff argues the testimony is admissible because it is consistent with other FRE 404(b) witnesses' testimony and supports Plaintiff's theory that Defendants used a "drop gun" after they shot Gonzalez.

The Court agrees that Bruno's testimony is inadmissible. Bruno could not identify any of the officers involved in the allegations, and Plaintiff has not pointed to any evidence suggesting any of the officers involved are Defendants or witnesses in this case. That another officer may have done what Bruno alleges, even if the officer worked in the same District as these Defendants, is not relevant or probative of anything the jury must decide in this case and, instead, is unduly prejudicial.

Defendants next seek to bar Stevie Blockson from testifying he was harassed by police in his neighborhood. Unless Blockson can identify one or more of the Defendants as the officers who allegedly harassed him, that such harassment occurred after the Gonzalez shooting, and that there is some connection between the alleged harassment and his being a witness in this case, this testimony also is barred for the reasons set forth above.

Defendants' motion is denied to the extent they seek to bar Plaintiff's own testimony about his interactions with one or more Defendants after the shooting. Plaintiff testified during his deposition that "every now and then" he sees one of the Defendant officers driving around the neighborhood, and that the Defendant officer slows down while passing Plaintiff's house and nods his head at Plaintiff. ECF No. 259-1 at 78-79, 81. Plaintiff apparently believes this conduct by a Defendant is related directly to this case. The Court will permit Plaintiff to testify about the conduct of an officer he identifies as a Defendant here. A reasonable jury could conclude that this conduct amounts to witness intimidation, which could be probative of the Defendant officer's consciousness of guilt and is not unduly prejudicial. *Mokol*, 646 F.3d at 483 (7th Cir. 2011). The weight such evidence would have is for the jury to decide.

Motion No. 29 is granted in part and denied in part.

**25.    Motion No. 30 to bar mention of the cartridge case found in P.O. Motyka's trunk.**

Defendants move to exclude evidence that an expended bullet cartridge was found in

Defendant Motyka's trunk.  Plaintiff does not oppose this motion, and therefore, it is granted.

Plaintiff, however, wants to admit evidence that a 9-millimeter cartridge case was found in the

trunk of Lt. Shouse's car.  Defendants reply that evidence is irrelevant.  Plaintiff's theory of

relevance apparently is that the cartridge was recovered and processed at the scene of the

Gonzalez shooting and, therefore, it should be presented to the jury.  Plaintiff also argues that

Shouse's gun was never tested to see if it was fired during the incident that claimed Gonzalez's

life or whether it could have fired the cartridge found in his trunk.  Shouse testified that he does

not believe the cartridge came from his gun.

The issue of the 9-millimeter cartridge recovered from Shouse's car was raised in

Plaintiff's response brief, not in Defendants' original motion.  To the extent that motion now

effectively has been amended to call for the exclusion of the 9-millimeter cartridge, the motion is

granted unless Plaintiff can better articulate or explain his relevance theory.

**26.    Motion No. 31 to bar introduction of Defendants' personal cell phone records.**

Defendants move to bar the personal cell phone records of the three named Defendants,

arguing that because they are heavily redacted, the jury will improperly speculate as to what was

redacted.  Defendants, however, are not moving to bar all evidence that they used their cell

phones to communicate with each other and other police officers before giving any formal

statement following the Gonzalez shooting; Defendants only seek to exclude the records

themselves because of heavy redaction.  The motion is denied.  Plaintiff intends to show that

Defendants had an opportunity to shape their story, and their cell phone records are relevant to

that theory and the officers' credibility.  The exhibits can be edited to remove any sensitive

information, such as individuals' telephone numbers, and that information can be replaced with language such as, "P.O. Motyka's phone number" or something similar. Any concern Defendants have regarding improper jury speculation is remote and, in any event, can be cured with a limiting instruction that the redacted information is not relevant to any issue in the case.

27. **Motion No. 32 to bar the use of graphic photographs of Gonzalez, blood, and bloody clothing.**

Defendants move to bar Plaintiff from using certain graphic photographs taken at the scene of the shooting and during the autopsy process as unfairly prejudicial. Defendants acknowledge, however, that some of these photographs may be relevant to testimony in the case. They ask Plaintiff to let Defendants and the Court know which photographs Plaintiff intends to offer at trial. The motion is taken under advisement. Plaintiff should be prepared to tender to the Court and Defendants before the pretrial conference the photographs he intends to offer into evidence, articulate his relevance theory as to those photographs, and respond to Defendants' FRE 403 arguments at the conference.

28. **Motion No. 33 to bar photographs taken from Bridgette Gaters' porch.**

Defendants seek to bar Plaintiff from using photographs taken from witness Bridgette Gaters' front porch that purportedly depict the scene of the shooting. Defendants contend that the photographs do not accurately depict the scene because landscaping has been removed and the pictures show other changes that occurred after the shooting. Defendants also argue that Plaintiff's photographs were taken three years after the shooting occurred and were not produced to Defendants during discovery. Plaintiff responds that Defendants also have marked as trial exhibits pictures they took from Gaters' porch more than a year after the shooting that do not perfectly depict the scene as it existed on the day of the shooting and that Gaters can testify about the differences in the photographs and how they impact, if at all, her view of the shooting on the

day in question. The motion is taken under advisement. The parties should tender to the Court before the pretrial conference the photographs they intend to use, and the Court will decide the issue with the actual photographs in hand.

**29.     Motion No. 34 to bar Plaintiff's proposed FRE 404(b) witnesses.**

Defendants move to bar Plaintiff's proposed FRE 404(b) witnesses, arguing that the evidence these witnesses will proffer is not relevant to any legitimate, non-propensity purpose and that any probative value the proffered evidence may have is far outweighed by unfair prejudice. Plaintiff responds that the proposed FRE 404(b) evidence will demonstrate that Defendants had the opportunity and plan to obtain a "drop gun" in advance of the Gonzalez shooting and a plan to say a fleeing suspect pointed a gun at them to justify shooting at the suspect, and that such evidence is relevant to matters other than propensity. The Court agrees with Defendants in large part. Motion No. 34 is granted.

### A. Factual Background

Plaintiff's proposed FRE 404(b) evidence stems from two incidents: a June 29, 2007 incident involving Anthony McGhee and Adrian Strong, and a July 25, 1999 incident involving Tywan Sawyer.

### i. McGhee/Strong Incident

Defendants anticipate Plaintiff's proposed FRE 404(b) witnesses Anthony McGhee, Adrian Strong, Cornilla Johnson, and Yvette Loggins will testify that on June 29, 2007, Defendant Olson and three non-defendant police officers conducted a traffic stop of McGhee and Strong, approached the vehicle with their guns drawn, removed McGhee and Strong from the vehicle, searched them, and removed items from their pockets. Strong saw an officer bend down and then stand up with a plastic bag of crystals in his hand. An officer produced a bag of white

substance to McGhee and told him he was in custody for drug possession. One of the officers told McGhee he would "get out of jail free" if he could locate a gun, but that he and Strong would go to the penitentiary if he could not. The officers permitted McGhee to make multiple phone calls in order to obtain a gun.

McGhee called Cornilla Johnson, his then-girlfriend, while he was in police custody because he knew she kept an old rifle in her attic. Johnson agreed to turn the rifle in to the officers and spoke on the phone with one of the officers about where to deposit the gun. She wrapped the rifle in a sheet or blanket, placed it in a garbage can, and watched as officers retrieved the rifle, placed it in the trunk of their car, and drove away.

Defendants tell a different story. According to Defendants, Olson and three other non-defendant officers stopped McGhee and Strong for a traffic violation. McGhee was arrested because he could not produce a driver's license. During the search incident to arrest, the officers discovered crack cocaine on McGhee, which McGhee admitted was his. The officers brought McGhee to the station, where he volunteered information about where a street gang had hidden drugs and guns because he was on parole and did not want to go back to prison. The officers drove around with McGhee while he placed phone calls about where to find the drugs and guns. When the information did not check out, the officers returned to the station and charged McGhee with possession of a controlled substance. McGhee later pled guilty to the charge.

Strong and Loggins initiated a formal complaint against Olson and the three other officers present at the traffic stop, alleging that McGhee and Strong were stopped and searched without justification, Strong's car was impounded without justification, drugs were planted on McGhee, the officers offered to release Strong and McGhee in exchange for a gun, and McGhee was falsely arrested. The allegations in the complaint were not sustained.

### ii. Sawyer Incident

Defendants anticipate Plaintiff's FRE 404(b) witness Tywan Sawyer will testify that on July 25, 1999, he was sitting on a parked car when three plainclothesed men jumped out of an unmarked vehicle with guns drawn and began chasing him. Sawyer ran away because the men did not identify themselves as police officers, and he was scared. The men fired their guns at Sawyer. Sawyer did not have a gun. Sawyer stopped running when he reached a church with several people standing outside. He immediately got on the ground with his arms outstretched. While he was on his stomach, the three men began beating him. They did not identify themselves as police officers until they handcuffed him and placed him under arrest. A detective later told him he was placed under arrest because one of the officers said he had a gun. He was charged with, and pled guilty to, aggravated assault of a peace officer.

According to Defendants, however, Olson and the two other non-defendant police officers were on patrol when they observed Sawyer with a semi-automatic pistol tucked into his belt area. Sawyer fled, and Olson and another officer gave chase. While running away, Sawyer turned and pointed his gun at Olson and the other officer. Olson and the other officer fired shots. No shots struck Sawyer, but when the shots were fired, Sawyer threw his gun underneath a parked van and continued running. A crowd formed around the van. The officers eventually apprehended Sawyer, who stated, "You can't do shit to me, I ain't got the gun" while being handcuffed. When the officers returned to the van to retrieve the gun, it was gone. Someone in the crowd yelled, "Ha ha, you ain't got no gun."

### B. Analysis

FRE 404(b) forbids introduction of evidence of a crime, wrong, or other act "to prove a person's character in order to show that on a particular occasion the person acted in accordance

46

with the character." FED. R. EVID. 404(b)(1). Other-act evidence may be admissible for other non-propensity purposes, however, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2).

This Circuit previously used a four-part test to evaluate the admissibility of other-act evidence under FRE 404(b). The four-part test required the district court to evaluate whether (1) the evidence was directed toward establishing a matter in issue other than the defendant's propensity to commit the act in issue; (2) the evidence showed that the other act was similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence was sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *United States v. Gomez*, 763 F.3d 845, 852-53 (7th Cir. 2014) (citations omitted).

The Seventh Circuit recently abandoned this four-part test in favor of a more straightforward, rules-based approach. *Id.* at 853. In *Gomez*, the Seventh Circuit addressed the question of whether a permissible ultimate purpose of other-act evidence cleanses an impermissible propensity purpose and ultimately concluded that it does not. As the Court of Appeals explained, it is not enough for the proponent of other-act evidence simply to point to a purpose other than propensity and assert that the other-act evidence is relevant to that permissible purpose because "FRE 404(b) is not just concerned with the ultimate conclusion, but also with the chain of reasoning that supports the non-propensity purpose for admitting the evidence." *Id.* at 856. Thus, FRE 404(b) "allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning." *Id.* at 856 (citations omitted).

*Gomez* makes clear that, when assessing the admissibility of other-act evidence, the district court must consider specifically how the prior act tends to serve a non-propensity

exception. *Id.* In doing so, the district court "must consider the chain of logic by which the jury is being asked to glean the defendant's knowledge, intent, etc., from proof of his prior misdeeds." *Id.* (citations omitted). If the relevance of other-act evidence is established only through a forbidden propensity inference, the evidence must be excluded. *Id.*

Even if the other-act evidence is relevant without relying on a propensity purpose, however, the district court still must exclude the evidence under FRE 403 if its probative value is substantially outweighed by a danger of unfair prejudice. *Id.* at 856-57. Other-act evidence raises "special concerns" under FRE 403 "because it almost always carries some risk that the jury will draw the forbidden propensity inference." *Id.* at 857. Thus, evidence that is slightly probative under a non-propensity theory but nevertheless has a high likelihood of leading a jury to draw a forbidden propensity inference must be excluded. *Id.*

### i. McGhee/Strong Incident

Defendants' motion to exclude evidence of the McGhee/Strong incident is granted. Plaintiff argues that the McGhee/Strong incident is evidence of Defendants' ability and plan to obtain a gun, stating that the incident establishes "how Defendant Olson could come to be in possession of a drop gun." ECF No. 260 at 6. Defendants argue that Plaintiff cannot establish a legitimate purpose for this evidence without relying on an inference of propensity and that the evidence is unduly prejudicial. The Court agrees. The evidence is inadmissible.

In the first place, Plaintiff cannot get over the relevance hurdle. Plaintiff argues that the McGhee/Strong incident demonstrates Olson and the other Defendants had access to a drop gun simply because they are able to confiscate guns from the street. But police officers have a duty to remove guns from the street. That Olson may have obtained a gun in the manner alleged on a prior occasion is only relevant if Olson did so specifically to use the gun he obtained as a drop

48

gun, and there is absolutely no evidence that was Olson's purpose when he allegedly confiscated a rifle from Cornilla Johnson. The danger of unfair prejudice to Olson, as well as the amount of trial time it would take for both Plaintiff and Defendants to present their versions of the McGhee/Strong incident, outweigh the very minimal probative value this evidence might have for the purpose of showing Olson had an opportunity or plan to obtain weapons to use as drop guns in subsequent incidents.

Moreover, as discussed above, other-act evidence is not admissible merely because it may serve a non-propensity purpose. Rather, the Court must consider specifically how the prior act serves a non-propensity purpose, and Plaintiff has not offered a propensity-free chain of reasoning to support his theory of relevance for the McGhee/Strong incident. Viewing the McGhee/Strong evidence in the light most favorable to Plaintiff, the only fact of minimal relevance is that, four years prior to the Gonzalez shooting, Defendant Olson confiscated a gun which he did not inventory. (And Defendants strongly contest this version of events.) There is no suggestion that the gun Olson allegedly recovered from the McGhee/Strong incident is the same gun recovered from Gonzalez after the shooting. Nor could there be such a suggestion: the McGhee/Strong incident involved a rifle; the gun recovered at the scene of the Gonzalez shooting was a handgun. Thus, Plaintiff's relevance theory relies on the inference that, since Olson confiscated a rifle in the past and did not inventory it, he may have done the same with a handgun sometime prior to the Gonzalez shooting, thereby providing him a handgun to drop next to Gonzalez's body. In other words, the only way the McGhee/Strong incident is relevant to an "opportunity" or "plan" here is by reasoning that, since Olson did this once before, he might have done it again sometime within four years of the Gonzalez shooting. That is precisely the sort of propensity evidence *Gomez* and FRE 404(b) forbid.

### ii. Sawyer Incident

Defendants' motion to exclude evidence of the Sawyer incident is granted. Plaintiff argues that the Sawyer incident is admissible as evidence of a plan in that "it shows that Defendant Olson concocted an incredibly unlikely story about the manner [in which] the officers' chase of Gonzalez occurred because that same story had worked in connection with the Sawyer shooting." ECF No. 260 at 3. According to Plaintiff, Olson lied about Gonzalez having a gun because he knew from the Sawyer incident that he would have to provide an explanation to his superiors for why he shot Gonzalez, and the explanation that a suspect pointed a gun at him was satisfactory.

Plaintiff's argument does not lay a convincing groundwork for admission of the Sawyer incident after *Gomez*. At base, Plaintiff's argument is that Olson did this once and it worked, so he did it again twelve years later. In other words, Olson's "plan" is to claim that a fleeing suspect pointed a gun at him to justify shooting at the suspect. That is propensity evidence that *Gomez* does not allow. It also is not much of a plan at all for a police officer to say that he shot and killed someone who pointed a gun at him when the law says he is not justified in using deadly force unless he is responding to a significant threat of death or serious bodily harm.

Plaintiff also argues that the Sawyer incident is admissible for impeachment and to show Olson's state of mind. Specifically, Plaintiff points to Olson's deposition testimony that he was "in disbelief" and "very afraid" when Gonzalez allegedly pointed a gun at him and suggests that, since Olson was involved in a similar situation with Sawyer twelve years earlier, he was not being truthful when he testified to his state of mind. ECF No. 260 at 5. This argument is extremely weak even if Olson gives the same testimony at trial, particularly given the twelve year gap in time. A reasonable person – police officer or otherwise – would not be unfazed

when facing what he believes to be a loaded weapon and a suspect about to shoot simply because someone else pointed a gun at him more than a decade prior. Further, a more direct line of questioning the credibility of Olson's "disbelief" would appear to flow from Olson's stated reason for pursuing Gonzalez in the first instance: he says he thought Gonzalez had a gun.

Even if Plaintiff were to attempt to impeach Olson with evidence that he was confronted by a fleeing suspect with a gun twelve years earlier, that would not open the door to evidence of the entire Sawyer incident. FRE 608(b) limits the use of extrinsic evidence in this regard. It also is worth noting that Plaintiff's suggested theory of impeachment depends on Sawyer actually having pointed a gun at Olson, a completely different theory than Plaintiff offers for admission of the Sawyer incident under FRE 404(b).

The Court also notes that FRE 403 applies "with full force" to other-act evidence, *Gomez*, 763 F.3d at 856, and cautions against a line of questioning that could veer into more information about the Sawyer incident than the Court would admit under FRE 404(b). Twelve years elapsed between the Sawyer incident and the Gonzalez shooting. Moreover, the evidence that the Sawyer incident occurred as Sawyer said it did is weak. Sawyer's testimony that he did not know he was being chased by police but went to a church, got into a surrender position, and waited for his pursuers to show up; the fact that no complaint was filed; and the fact that he pled guilty to misdemeanor assault all undercut his account of events. The risks of unfair prejudice against Olson, misleading the jury, confusing the issues, and wasting time so that each side can present its version of the facts substantially outweigh whatever limited probative value this evidence might have toward Olson's credibility and/or his state of mind.

At this juncture, the Court is not barring Plaintiff from asking Olson a simple question, such as, "This is not the first time someone pointed a gun at you in the line of duty, correct?" and

pursuing limited follow-up depending on his answer. Such questioning, however, would not open the door to the entire Sawyer incident. To the extent that Plaintiff or Defendants have questions about the scope of the Court's ruling in this regard, those questions should be addressed at the pretrial conference. The Court does not intend, for example, to allow Defendants to bring out their entire theory of how the Sawyer incident unfolded if Plaintiff asks the kind of limited questions discussed here. The Court assumes that is not Defendant's intent.

Plaintiff's last argument that the Sawyer incident is admissible as impeachment for other unspecified purposes is premature. As it stands, Plaintiff has not identified a legitimate purpose for introducing the Sawyer incident. If Plaintiff seeks at trial to introduce the Sawyer incident for a purpose not identified in his response brief, but which he believes is legitimate given the course of trial, he shall first notify the Court and opposing counsel outside the presence of the jury of his reasons for doing so, and the Court will rule in context at that time.

30.     **Motion No. 35 to bar testimony, evidence, and argument of other shootings, alleged misconduct, civil lawsuits, or other uses of force.**

Defendants' final motion *in limine* seeks to exclude three categories of evidence: (1) evidence, testimony, or argument regarding other incidents in which Defendant Olson fired his weapon; (2) evidence of civilian complaints, lawsuits, and disciplinary histories of any police officers; and (3) evidence of any incidents in which Defendants and/or any non-defendant police witnesses used force in the course of their duties. Defendants' motion is granted in part and denied without prejudice in part.

**A. Other incidents in which Olson fired his weapon.**

Defendants first move to bar Plaintiff from introducing evidence of other instances in which Olson fired his weapon. Specifically, Defendants seek to bar evidence that Olson shot dogs on three separate occasions. In this regard, the motion is granted. Plaintiff points to

various reasons this evidence should be admissible, none of which are persuasive. Plaintiff first argues that such evidence may be admissible to Olson's state of mind during the Gonzalez shooting. As discussed above, prior instances in which Olson may have discharged his weapon are not relevant to Olson's state of mind during the Gonzalez shooting and are unduly prejudicial. They are not admissible for that purpose. If evidence that Olson discharged his weapon in the line of duty is relevant to some legitimate purpose, an issue the Court will discuss with the parties at the pretrial conference, there may be less prejudicial ways to elicit that evidence than that Olson shot three dogs.

Plaintiff also asserts that this evidence may be used to challenge certain defenses, such as if Olson testifies at trial that he paused during the foot pursuit of Gonzalez because his gun malfunctioned. Plaintiff intends to challenge Olson's possible testimony on that issue by eliciting evidence that Olson's gun had never malfunctioned before, thereby presumably casting doubt on whether the gun actually malfunctioned the day of the Gonzalez shooting. Plaintiff did not go into detail on the relevance of Olson pausing during the foot pursuit, and it is not immediately clear to the Court why any such pause is relevant here. Whether or not Olson's gun malfunctioned in the past also does not appear to bear on the likelihood of it malfunctioning sometime later. In any event, it would seem that Plaintiff can elicit testimony from Olson that his gun never malfunctioned before without having to introduce evidence of any specific prior dog shootings.

Finally, Plaintiff argues that this evidence may be necessary for impeachment. FRE 608(b) limits the admissibility of this evidence. The Court has not categorically barred inquiry into this matter for impeachment purposes at this juncture. If Plaintiff wants to inquire of Olson concerning his prior shootings for impeachment purposes, however, he shall first notify the

Court and opposing counsel outside the presence of the jury of the specific inquiry he intends to make and the reasons that inquiry is relevant and otherwise proper in light of FRE 403, 404, 608, and any other applicable rules.

### B. Civilian complaints, lawsuits, and disciplinary histories of police officers.

Defendants next move to bar evidence of civilian complaints, lawsuits, and disciplinary histories of Defendants and other police officer witnesses. Defendants do not state with any specificity which complaints, lawsuits, or disciplinary histories relating to which officers they are seeking to bar. For that reason, motion is denied without prejudice as overbroad. The Court agrees with Plaintiff that the relevance of any particular complaint register or any disciplinary record depends largely on the testimony given and defenses raised at trial. For that reason, the Court will not bar an entire category of evidence at this juncture.

The Court does note, however, that any such evidence Plaintiff may attempt to introduce will be subject to analysis under FRE 401 through 404 and 608. Plaintiff shall notify the Court and opposing counsel outside the presence of the jury if he intends to introduce any such evidence, and he must articulate a legitimate, propensity-free chain of reasoning to support its admission.

### C. Other incidents in which police officers used force in the course of their duties.

Lastly, Defendants seek to bar evidence of any incidents in which Defendants and/or any non-defendant police witnesses used force in the course of their duties, including, but not limited to, those documented in various Tactical Response Reports ("TRRs") and arrest reports completed by the Defendant officers and other police witnesses. This, too, is overbroad and is denied without prejudice. In light of FRE 403 and 404(b) concerns, however, if Plaintiff intends to elicit any evidence of prior uses of force by Defendants and other police witnesses not

addressed in this memorandum opinion and order, he shall notify the Court and opposing counsel outside the presence of the jury.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motions *in Limine* No. 1, 2, 3, 4, 5, 6, 7, 8, 10, and 12 are granted. Plaintiff's Motions *in Limine* No. 9, 11, and 14 are denied. Plaintiff's Motion *in Limine* No. 13 is reserved for trial.

Defendants' Motions *in Limine* No. 2, 4, 5, 9, 10, 11, 12, 13, 15, 18, 20, 25, 27, 30, and 34 are granted. Defendants' Motions *in Limine* No. 1, 7, 8, 22, 23, 29, and 35 are granted in part and denied in part. Defendants' Motion *in Limine* No. 24 is granted in part and taken under advisement in part. Defendants' Motions *in Limine* No. 3, 6, 14, 16, 17, 21, 26, and 31 are denied. Defendants' Motion *in Limine* No. 19 is denied in part and taken under advisement in part. Defendants' Motions *in Limine* No. 28, 32, and 33 are taken under advisement.

By June 18, 2015, Plaintiff shall submit to Defendants and to the Court, in camera, any photos Plaintiff intends to introduce at trial of Pedro Gonzalez III following the shooting at issue in this case, as well as any photos he intends to introduce at trial of the post-shooting scene, Gonzalez's bloody clothing, autopsy photos, and any other photos likely to draw the sort of objections encompassed by Defendants' Motion *in Limine* No. 32. By June 18, 2015, Plaintiff and Defendants shall also submit to the Court, in camera, any photos the parties intend to introduce at trial taken from witness Bridgette Gaters' porch that are encompassed by Defendants' Motion *in Limine* No. 33.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: June 12, 2015

55